IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANIEL RODRIGUEZ, as Executor of the
Estate of HARRY RODRIGUEZ,

Plaintiff,

v.

CHICAGO POLICE OFFICERS Special Representative
For ERNEST HALVORSEN, Deceased,
EDWIN DICKINSON, and REYNALDO GUEVARA,
Special Representative for LIEUTENANT,
EDWARD KIJOWSKI, Deceased,
OFFICER DENNIS PALASZ,
former COOK COUNTY ASSISTANT STATE'S
ATTORNEY BILL KOPEC, UNIDENTIFIED
EMPLOYEES OF THE CITY OF CHICAGO, the
COUNTY OF COOK, and the CITY OF CHICAGO,

Defendants.

Case No. 26cv7144

JURY DEMAND

**CIVIL RIGHTS COMPLAINT**

Plaintiff, DANIEL RODRIGUEZ, as Executor of the Estate of HARRY RODRIGUEZ, by his undersigned attorneys, complains of Defendants Chicago Police Officers Special Representative ERNEST HALVORSEN, EDWIN DICKINSON, and REYNALDO GUEVARA, Special Representative for LIEUTENANT EDWARD KIJOWSKI, OFFICER DENNIS PALASZ, former Cook County Assistant State's Attorney BILL KOPEC, the CITY OF CHICAGO, the COUNTY OF COOK, and as-yet UNKNOWN CITY OF CHICAGO EMPLOYEES, as follows:

**INTRODUCTION**

1. Harry Rodriguez was wrongfully convicted in 1988 of the murder of Raymond Carvis, a brutal crime he did not commit. Sentenced to life in prison without the possibility of parole, Mr. Rodriguez spent the remainder of his life incarcerated for a murder committed by someone else. He died in prison from complications related to Multiple Sclerosis, never having lived a single day as a free man after his wrongful conviction. This action is brought by Daniel

Rodriguez, Executor of the Estate of Harry Rodriguez, to seek justice for the grievous wrong done to Harry Rodriguez and for the suffering he endured until his death.

2. Harry Rodriguez's wrongful conviction was no accident. From the outset, there was a credible, identified suspect — Rudolfo Ramirez, who had been having an intimate affair with the victim and had a date scheduled with him on the very day of the murder. Ramirez failed a polygraph examination and could not be eliminated as a suspect. But Defendants had other plans. The Commander of the 14th District Tactical Unit assigned Detective Halvorsen to the investigation with the explicit intent of using Mr. Carvis's murder to falsely convict members of the Spanish Cobras street gang as part of a scheme called "Operation Mongoose." Rather than pursue the man with motive and opportunity, Defendants abandoned the Ramirez investigation entirely and turned their focus to framing young Hispanic men with gang affiliations.

3. Defendants Halvorsen, Dickinson, and Kijowski, working together, coerced false, inculpatory statements from Robert Cardona, Gregorio Cardona, Lowell Higgins-Bey, and Michael McCastle by feeding them the details of the crime, isolating them, and using threats and promises of leniency. When McCastle refused to confess, Defendants simply fabricated a confession and attributed it to him in police reports. It was Lieutenant Kijowski himself who manufactured the identification of Harry Rodriguez as a participant — consulting his own gang photo books to match the street name "Tony" to Mr. Rodriguez, then showing Mr. Rodriguez's photograph to the other men to have them "confirm" the identification Kijowski had already made.

4. When a critical flaw emerged in Defendants' scheme — Amador "Pee Wee" Torres, whom the coerced witnesses had been instructed to name, turned out to have been in police custody at the time of the murder — Defendant Halvorsen enlisted Defendant Guevara to find a

replacement. Guevara located Fernando Gomez, whose street nickname was also "Pee Wee," and proceeded to beat and torture him — repeatedly striking and choking him, causing lasting injury to his eye — until Gomez agreed to falsely confess and to falsely implicate Harry Rodriguez and the others in Mr. Carvis's murder.

5. Harry Rodriguez was convicted based solely on the false trial testimony of Lowell Higgins-Bey and Fernando Gomez — testimony procured through Defendants' unconstitutional conduct, and delivered pursuant to plea agreements that Defendants and Defendant ASA Kopec arranged in exchange for that testimony. No physical or forensic evidence connected Mr. Rodriguez to the crime.

6. Both Higgins-Bey and Gomez have since recanted in sworn affidavits, attesting that their statements and testimony were false and were the product of the coercion, threats, and physical abuse described herein. Post-conviction forensic DNA testing of the murder weapon — the knife used to stab Mr. Carvis at least nineteen times with such force that the blade tip broke off inside him — excludes Mr. Rodriguez, and each of his co-defendants, as the source of an unknown male DNA profile found on the knife's handle. The DNA of the true perpetrator, an unknown male, is on the murder weapon. Harry Rodriguez's DNA is not.

7. On July 1, 2025 — nearly four decades after Mr. Rodriguez was first arrested — the Circuit Court of Cook County granted the Petition for Relief from Judgment filed on behalf of Mr. Rodriguez and his co-defendants, and the State nolle prossed all charges. A petition for a Certificate of Innocence was filed on his behalf, represented by Daniel Rodriguez as Executor of his Estate. Harry Rodriguez did not live to see this day.

8. The misconduct that caused Harry Rodriguez's wrongful conviction and death in prison was not an aberration. Defendants Halvorsen and Guevara have a long, documented history of framing innocent men — predominantly young Hispanic men in the Humboldt Park neighborhood — for crimes they did not commit. Detective Halvorsen has been credibly implicated in framing at least ten separate individuals who have since been exonerated, and has invoked his Fifth Amendment privilege against self-incrimination in civil depositions when asked whether he and Detective Guevara randomly selected gang members to frame for murders. The City of Chicago permitted these detectives to operate with impunity for decades.

9. This lawsuit seeks redress for Harry Rodriguez's wrongful conviction, his decades of wrongful incarceration, his suffering and death in prison from Multiple Sclerosis — a disease he endured without the care, support, and comfort of family and freedom — and the loss of everything that was taken from him by Defendants' deliberate misconduct.

**JURISDICTION AND VENUE**

10. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of law, of Harry Rodriguez's rights as secured by the United States Constitution. This action is also brought pursuant to Illinois statutes.

11. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction. Defendant City of Chicago is a municipal corporation located here. Defendant Cook County is a governmental entity within the State of Illinois.

## PARTIES

12. Plaintiff Daniel Rodriguez is the duly appointed Executor of the Estate of Harry Rodriguez, pursuant to Cook County Probate Court Case Number 22 PR 59. He brings this action on behalf of the Estate of Harry Rodriguez and, where applicable, as a wrongful death representative of Harry Rodriguez's survivors. Harry Rodriguez died in prison from complications related to Multiple Sclerosis, having been wrongfully incarcerated from the time of his conviction in January 1988 until his death.

13. Defendant Ernest Halvorsen was at all relevant times a detective with the Chicago Police Department, assigned to Area Five, employed by Defendant City of Chicago, and acting within the scope of his employment. Defendant Halvorsen is now deceased. A Special Representative of the Estate of Ernest Halvorsen, as successor in interest will be appointed and defend this action on behalf of Defendant Halvorsen's Estate. The Estate of Ernest Halvorsen is sued in its representative capacity.

14. At all relevant times, Defendant Edwin Dickinson was a detective with the Chicago Police Department, assigned to Area Five, employed by Defendant City of Chicago, and acting within the scope of his employment. He is sued in his individual capacity.

15. At all relevant times, Defendant Edward Kijowski was a lieutenant with the Chicago Police Department, commanding the 14th District Tactical Unit, employed by Defendant City of Chicago, and acting within the scope of his employment. He is sued in his individual capacity.

16. At all relevant times, Defendant Dennis Palasz was a police officer with the Chicago Police Department, assigned to the 14th District Tactical Unit under the command of

Defendant Kijowski, employed by Defendant City of Chicago, and acting within the scope of his employment. He is sued in his individual capacity.

17. At all relevant times, Defendant Reynaldo Guevara was a detective with the Chicago Police Department who worked closely with Defendant Halvorsen, employed by Defendant City of Chicago, and acting within the scope of his employment. He is sued in his individual capacity.

18. At all relevant times, Defendant Bill Kopec was an Assistant State's Attorney in the Cook County State's Attorney's Office. He is sued in his individual capacity.

19. Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois. The City of Chicago is liable for all torts committed by the Defendant Officers pursuant to the doctrine of respondeat superior and is additionally responsible for the policies and practices of the Chicago Police Department.

20. Defendant Cook County is a governmental entity within the State of Illinois, and it is obligated to indemnify employees of the Cook County State's Attorney's Office, including Defendant Kopec.

## FACTS

**The Stabbing Death of Raymond Carvis**

21. At approximately 5:00 p.m. on June 23, 1987, the body of 47-year-old Raymond Carvis was discovered in the second-floor dressing room of his home at 2637 North Sawyer Avenue in Chicago. Although the scene was bloody and gruesome — Mr. Carvis had been stabbed at least nineteen times with such violence that the tip of the knife blade broke off inside his neck

— no physical evidence at the crime scene ever tied Harry Rodriguez or any of his co-defendants to the murder.

22. Police recovered two knives from a kitchen drawer in the home, including a cake knife with a broken blade. The missing blade tip was recovered from Mr. Carvis's body, confirming the murder weapon. Fingerprints were collected from the scene, and extensive physical evidence was gathered, yet nothing connected Mr. Rodriguez or any of the men who would be charged with this crime to the scene.

**The Initial Investigation Identified a Prime Suspect — Rudolfo Ramirez — Whom Defendants Abandoned in Favor of "Operation Mongoose"**

23. From the outset of the investigation, detectives other than Defendants Halvorsen and Dickinson developed substantial evidence implicating a man named Rudolfo Ramirez. Ramirez had been having an intimate affair with the victim and was reported to have had a date scheduled with Mr. Carvis on the very day of his murder. Multiple witnesses identified Ramirez as connected to the victim and having been seen near the scene. Ramirez repeatedly changed his account of his whereabouts on the day of the murder.

24. Defendant Lieutenant Kijowski himself brought Ramirez in for questioning, during which Ramirez asserted that he had no involvement in Mr. Carvis's death. However, Ramirez subsequently failed a polygraph examination and was soon verified to have had a close, intimate relationship with the victim, corroborating the motive of a romantic dispute. The polygraph examiner concluded that Ramirez "cannot be eliminated as a suspect."

25. Despite this substantial evidence, the investigation was reassigned — without explanation — to Defendants Halvorsen and Dickinson. The Commander of the 14th District Tactical Unit assigned Detective Halvorsen to the investigation with the explicit intent of using

Mr. Carvis's murder to target suspected members of the Spanish Cobras street gang as part of a scheme known as "Operation Mongoose." From the moment of their assignment, all investigation into Rudolfo Ramirez ceased entirely, and his name was never again mentioned in any police report. No further investigation of any alternative suspect was ever conducted.

**Lieutenant Kijowski Generates the Anonymous "Tip" and Manufactures the Identification of Mr. Rodriguez**

26. On July 9, 1987, purportedly, an "anonymous tip" reached detectives stating that a man known as "Bey" had been overheard discussing the Carvis murder. Defendants Halvorsen and Dickinson identified "Bey" as Lowell Higgins-Bey and set their investigative focus on Mr. Higgins-Bey and his associates.

27. On July 13, 1987, Defendants Halvorsen and Dickinson met with Defendant Kijowski at the 14th District. Defendant Kijowski provided Halvorsen and Dickinson with additional "street informant" information — the sourcing and reliability of which was never established — identifying Robert Cardona as someone seen in connection with the crime. Defendant Kijowski stated that he would locate Robert Cardona himself.

28. On July 14, 1987, Defendant Kijowski contacted Defendants Halvorsen and Dickinson to inform them that he had Robert Cardona in his office and had obtained a statement from him. In that statement — obtained by Defendant Kijowski through his own interview under his supervision — Robert Cardona described seeing individuals he knew by street names. Defendant Kijowski then showed Cardona photo books maintained by the 14th District Tactical Unit, and Cardona "identified" individuals whose photographs Kijowski selected.

29. Critically, when Lowell Higgins-Bey and Michael McCastle were arrested on July 15, 1987, they referred to the participants in the crime only by street names — including "Tony,"

"Pee Wee," "Lil Coco," and "Scandalous." It was Defendant Kijowski — not Higgins-Bey, not McCastle, and not any independent witness — who, through his self-professed "knowledge of gang members in the 14th District," first determined that "Tony" was Harry Rodriguez. Defendant Kijowski then showed photographs he had selected — including a photograph of Harry Rodriguez — to Higgins-Bey and McCastle, who merely "confirmed" the identification Kijowski had already made. There was no independent recognition, no spontaneous identification, and no corroboration. The identification of Harry Rodriguez as a suspect in Raymond Carvis's murder originated entirely from Defendant Kijowski's own selection of his photograph from a gang book.

**Officer Palasz Executes Arrests Based on Defendants' Fabricated Identifications**

30. On July 15, 1987, Defendant Officer Dennis Palasz and other members of Defendant Kijowski's tactical unit arrested Lowell Higgins-Bey and Michael McCastle at 1944 N. Spaulding Avenue. Defendant Palasz is listed as an arresting or assisting officer on the arrest reports for multiple individuals taken into custody in connection with this investigation, including Lowell Higgins-Bey, Michael McCastle, Robert Cardona, Gregorio Cardona, and Amador Torres — each of whom was arrested and charged based on the identifications that Defendants Kijowski, Halvorsen, and Dickinson had manufactured. Defendant Palasz participated in these arrests with knowledge that the underlying identifications, including the identification of Harry Rodriguez as "Tony," had been generated by Defendant Kijowski from a gang photo book rather than from any genuine, independent witness recognition.

**Defendants Coerce False, Inculpatory Statements from Higgins-Bey, McCastle, Robert Cardona, and Gregorio Cardona — and Fabricate a Confession for McCastle**

31. Following the arrests, Defendants Halvorsen, Dickinson, and Kijowski, rotating in and out of interrogation rooms over the course of approximately fourteen hours, subjected Lowell Higgins-Bey, Michael McCastle, Robert Cardona, and fourteen-year-old Gregorio Cardona to a

sustained and relentless interrogation. Defendants used psychological intimidation, threats of lengthy prison sentences and the death penalty, false promises of leniency, and the feeding of crime-scene details to coerce false, inculpatory statements from each of these men.

32. Defendant Halvorsen falsely told each of the men that the others had already implicated them. Robert Cardona was shown his teenage brother Gregorio in custody, frightened and crying, to increase the pressure on him to comply. Each man was fed the details of the crime — the number of stab wounds, the location of the stolen property, the layout of the victim's home — and instructed to incorporate those details into a statement.

33. When Michael McCastle refused to confess, Defendants did not merely fail to obtain a statement — they fabricated one. Defendants created police reports falsely documenting McCastle as having confessed to participation in the crime. McCastle never gave any such statement. His purported "confession" was a wholesale fabrication, created by Defendants to bolster the false case against Harry Rodriguez and the others.

34. In his coerced statement, Lowell Higgins-Bey — reciting the false narrative supplied to him by Defendants — stated that a group including Harry Rodriguez had planned and carried out a robbery of Mr. Carvis's home during which Mr. Rodriguez had stabbed Mr. Carvis to death. In his coerced statement, Robert Cardona described a similar false scenario. These statements were not independent accounts; they were dictated by Defendants and parroted back by men who had been broken by hours of coercive interrogation.

35. Defendants Halvorsen, Dickinson, and Kijowski knew that these statements were false, coerced, and a mere recitation of the false narrative Defendants had constructed.

Nevertheless, they used these statements to build a criminal case against Harry Rodriguez, who was at that time incarcerated at the Cook County Jail on an unrelated matter.

**<u>Defendants' Scheme Nearly Unravels; Defendant Guevara Is Enlisted to Torture Fernando Gomez Into Replacing "Pee Wee" Torres</u>**

36. A serious flaw emerged in Defendants' manufactured case: the coerced statements named Amador "Pee Wee" Torres as one of the participants. On July 31, 1987, Torres surrendered himself, accompanied by his juvenile probation officer, who confirmed that Torres had been in police custody at the time of — and throughout the month surrounding — Mr. Carvis's murder. Torres could not have been involved.

37. Rather than acknowledge that their fabricated confessions had collapsed, Defendant Halvorsen enlisted Defendant Guevara to locate a substitute for Torres. Guevara identified Fernando Gomez, a young man whose street nickname was also "Pee Wee" and with whom Guevara had previous contacts, as a suitable replacement.

38. Fernando Gomez was arrested and taken to the 14th District station, where he was held without food, rotated between a holding cell and an interrogation room while handcuffed to the wall, until Defendants Guevara and Halvorsen arrived. Upon arrival, Defendant Guevara subjected Mr. Gomez to approximately ten hours of sustained physical abuse and psychological coercion: Guevara repeatedly struck and choked Mr. Gomez, causing a serious injury to Mr. Gomez's right eye that he continues to suffer from to this day. Defendant Guevara threatened Mr. Gomez with a lengthy prison sentence or the death penalty if he refused to cooperate, and promised leniency if he complied.

39. Defendant Halvorsen separately told Mr. Gomez that he could go home if he signed papers Defendant Halvorsen had prepared. Mr. Gomez, who could not read, signed the papers as

instructed, not understanding that he was signing a false inculpatory statement. Mr. Gomez was then taken to Area Five headquarters, again handcuffed to a wall, and beaten further by Defendant Guevara until Gomez agreed to say whatever Guevara instructed. Defendant Guevara then coached Mr. Gomez extensively on the details of the crime, showed him photographs of the victim and of Harry Rodriguez and the other men, told Mr. Gomez their names, and instructed Mr. Gomez on how to describe the supposed events.

40. Mr. Gomez then provided a court-reported statement — fabricated and dictated to him by Defendants Halvorsen and Guevara — falsely stating that he had accompanied Harry Rodriguez and the others to rob Mr. Carvis's home and that Mr. Rodriguez had stabbed Mr. Carvis to death. Defendant Halvorsen was present for this statement.

<u>**Defendant Kopec Arranges False Trial Testimony in Exchange for Pleas**</u>

41. Defendant Kopec, as the Assistant State's Attorney assigned to this investigation, knowing that the confessions were fabricated proceeded to prosecute the defendants and the first trial was Harry Rodriguez's where he faced the death penalty.

42. Defendant Kopec, knowing that his case was extremely weak, but wanting to secure convictions as a part of the conspiracy that was Operation Mongoose arranged plea agreements with both Fernando Gomez and Lowell Higgins-Bey in exchange for their testimony against Harry Rodriguez, the Cardona brothers, and Michael McCastle at trial. Higgins-Bey pleaded guilty to residential burglary and received a four-year sentence; the murder, home invasion, and armed violence counts against him were dropped. Gomez likewise pleaded guilty to residential burglary and home invasion and received a four-year sentence; his murder and armed violence counts were dropped. As part of these arrangements, Gomez and Higgins-Bey testified against the others at trial, repeating and elaborating upon the false narratives that had been coerced from them.

Defendant Kopec prepared both men for their testimony, including providing Gomez with instructions on how to re-enact the purported physical confrontation between the victim and the alleged participants — coaching a witness to perform fabricated testimony.

43. None of the Defendants disclosed to the trial prosecutors, to Harry Rodriguez, or to his defense counsel the true circumstances under which the statements and testimony of Gomez and Higgins-Bey had been obtained — including the physical abuse, beatings, threats, promises of leniency, and feeding of crime-scene details described throughout this Complaint.

**Harry Rodriguez Is Convicted and Sentenced to Life; He Dies in Prison**

44. On January 7, 1988, following a jury trial before the Honorable Judge Durkin, Harry Rodriguez was convicted of murder, home invasion, and residential burglary. The sole evidence used against him was the false trial testimony of Lowell Higgins-Bey and Fernando Gomez — testimony procured through Defendants' unconstitutional conduct. No physical or forensic evidence connected Mr. Rodriguez to the murder of Raymond Carvis.

45. On March 25, 1988, Mr. Rodriguez was sentenced to life imprisonment without the possibility of parole on the murder count, plus consecutive terms of thirty years for home invasion and fifteen years for residential burglary. (A conviction for armed violence was subsequently nolle prossed on January 23, 1992.) Throughout his incarceration, Mr. Rodriguez maintained his innocence and pursued every available legal remedy, filing multiple post-conviction petitions that were denied.

46. Harry Rodriguez died in prison from complications related to Multiple Sclerosis, never having been released or exonerated in his lifetime. He was denied the opportunity to live as a free man, to receive adequate care and comfort from his family during his illness, and to see

justice done. The State did not vacate his conviction and nolle prosse the charges against him until July 1, 2025 — long after his death. A petition for a Certificate of Innocence was subsequently filed on his behalf, represented by Daniel Rodriguez as Executor of his Estate, pursuant to Cook County Probate Court Case Number 22 PR 59.

**Post-Conviction Evidence Establishes Harry Rodriguez's Innocence**

47. In a sworn affidavit, Lowell Higgins-Bey recanted his 1987 statement and his trial testimony against Harry Rodriguez and the other defendants. He attested that his statement and testimony were false and were the product of physical abuse and coercion by Defendant Halvorsen and other investigators, who fed him the details of the crime and drafted the statement for him to repeat.

48. In a sworn affidavit dated July 23, 2024, Fernando Gomez likewise recanted his 1987 statement and his trial testimony, attesting that both were false and were the product of the beatings, choking, and torture inflicted by Defendants Guevara and Halvorsen, and the participation of Defendant Kopec described above.

49. Pursuant to an agreed order entered on March 26, 2021, crime-scene evidence — including the murder weapon — was submitted for forensic DNA testing. On March 9, 2022, the Forensic Analytical Crime Lab completed its analysis, revealing an unknown male DNA profile on the handle of the knife used to kill Mr. Carvis — the same knife used to stab him at least nineteen times. Harry Rodriguez, each of his co-defendants, the victim, and every other known individual were excluded as the source of this profile. In a crime of this extraordinarily violent and close-contact nature, the presence of an unknown male's DNA on the murder weapon, combined with the complete absence of any DNA from Harry Rodriguez on that weapon or any other crime-

scene evidence, constitutes powerful and compelling evidence that Harry Rodriguez did not participate in this murder.

50. On August 7, 2024, a joint Petition for Relief from Judgment Pursuant to 735 ILCS 5/2-1401 was filed on behalf of Harry Rodriguez and his co-defendants. On July 1, 2025, the Circuit Court of Cook County granted the petition, and the State nolle prossed all charges. A Petition for Certificate of Innocence was filed on behalf of Harry Rodriguez's Estate, represented by Daniel Rodriguez as Executor. Harry Rodriguez was not able to obtain a certificate of innocence because the court held that the action did not survive the death of the petitioner, but the five living petitioners were all granted certificates of innocence. The denial of Rodriguez's petition was not on the merits. But the technical procedural rules of the COI statute.

**Defendants Halvorsen and Guevara's Documented Pattern and Practice of Framing Innocent Men**

51. The misconduct described above was not an aberration. It was part of a deliberate, long-standing pattern and practice by Defendants Halvorsen and Guevara of fabricating confessions, coercing false witness statements, manufacturing identifications, and framing innocent men — predominantly young Hispanic men from the Humboldt Park neighborhood — for serious crimes they did not commit.

52. Defendant Halvorsen has been credibly implicated in framing at least ten separate individuals who have since been exonerated. Numerous additional credible allegations of investigative misconduct against Defendant Halvorsen have resulted in wrongful convictions. This pattern and practice includes influencing, coercing, and manipulating individuals to make false confessions and identifications — a practice Defendant Halvorsen and his colleagues described internally as "hooking up" suspects.

53. In a civil deposition in *Montanez v. Guevara*, No. 17 CV 4560, Defendant Halvorsen was asked directly about his practice of framing men in the Humboldt Park area. He invoked his Fifth Amendment right against self-incrimination in response to each of the following questions, among others: whether he and Detective Guevara routinely framed gang members for murders in the Humboldt Park area; whether he randomly decided which gang members to frame for murders; whether he had any reason to believe a particular individual was actually responsible for the murder attributed to him; and whether he decided, along with Detective Guevara, to frame that individual. Defendant Halvorsen's repeated invocation of the Fifth Amendment in response to questions about his investigative conduct is itself powerful evidence of the misconduct described herein.

54. The pattern and practice of misconduct attributable to Defendants Halvorsen and Guevara has resulted in numerous vacated wrongful convictions, including, among others: the wrongful convictions of Armando Serrano and Jose Montanez (resulting in a $20.5 million settlement); the wrongful convictions of Robert Almodovar and William Negron; the wrongful conviction of Angel Rodriguez; the wrongful convictions of Jose Maysonet Jr., Alfredo Gonzalez, Justino Cruz, and Christopher Gossens; the wrongful convictions of Arturo DeLeon-Reyes and Gabriel Solache; the wrongful conviction of Thomas Sierra; and the wrongful conviction of Robert Bouto.

55. The City of Chicago had actual knowledge, both before and after Harry Rodriguez's wrongful conviction and death, of this documented pattern and practice of misconduct by Defendants Halvorsen and Guevara. Despite that knowledge, the City failed to investigate, discipline, retrain, or remove either detective, thereby enabling them to continue to fabricate evidence and frame innocent men for years.

**Harry Rodriguez's Damages**

56. As a direct and proximate result of Defendants' misconduct, Harry Rodriguez was wrongfully convicted of murder and sentenced to life in prison. He spent the remainder of his life — decades — incarcerated for a crime he did not commit.

57. During his incarceration, Mr. Rodriguez suffered from Multiple Sclerosis, a progressive and debilitating disease. He endured this illness without the care, comfort, support, and companionship of his family that he would have had as a free man. He received institutional medical care, separated from loved ones, stripped of the ability to make decisions about his own health and treatment in the way a free person could. He suffered and ultimately died in prison as a direct consequence of the years he was wrongfully imprisoned.

58. Mr. Rodriguez was stripped of every basic pleasure and freedom of human life: his young adulthood, the opportunity to live independently, to form and sustain family relationships, to pursue a career, to experience love and loss as a free man, and to face illness and death with the dignity of freedom. His survivors have suffered the loss of his companionship, society, and support.

59. The Estate of Harry Rodriguez has suffered damages including but not limited to his physical suffering, the pain and suffering of his death from Multiple Sclerosis while wrongfully incarcerated, his mental and emotional anguish during his wrongful incarceration, the loss of his normal life and all its attendant freedoms and experiences, and the loss of his survivors' society — all proximately caused by Defendants' misconduct.

**COUNT I – 42 U.S.C. § 1983 Fabrication of Evidence / Violation of Due Process (Fourteenth Amendment)**

60. Each paragraph of this Complaint is incorporated as if restated fully herein.

61. As described more fully above, Defendants Halvorsen, Dickinson, Kijowski, Palasz, Guevara, and Kopec, acting individually, jointly, and in conspiracy with one another, deliberately fabricated false identifications and coerced statements implicating Harry Rodriguez in the murder of Raymond Carvis — including Defendant Kijowski's fabrication of the identification of Mr. Rodriguez from a gang photo book, the coerced statements of Higgins-Bey and the Cardona brothers, the fabricated "confession" attributed to McCastle, and the tortured statement of Fernando Gomez — knowing all of this evidence to be false.

62. Defendants used this fabricated evidence, and the trial testimony of Higgins-Bey and Gomez that was procured through this misconduct, to secure Harry Rodriguez's wrongful prosecution and conviction. Absent this fabricated evidence, no prosecution of Harry Rodriguez could have proceeded.

63. Defendants' fabrication of evidence directly and proximately caused Harry Rodriguez's unjust conviction, his life sentence, his wrongful incarceration until his death, his physical suffering and death from Multiple Sclerosis while imprisoned, and all other injuries described herein, in violation of the Due Process Clause of the Fourteenth Amendment.

64. The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Harry Rodriguez and the deprivation of his liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Harry Rodriguez could not have and would not have been pursued.

65. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Harry Rodriguez's clear innocence.

66. As a result of the Defendants' misconduct described in this Count, the Estate of Harry Rodriguez suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, including those more fully described in the damages section above.

**COUNT II – 42 U.S.C. § 1983 Brady Violation – Suppression of Exculpatory Evidence (Fourteenth Amendment)**

67. Each paragraph of this Complaint is incorporated as if restated fully herein.

68. Defendants possessed material, exculpatory, and impeaching information that was never disclosed to Harry Rodriguez or his defense counsel, including: the fact that the identification of Mr. Rodriguez originated from Defendant Kijowski's gang photo book rather than from any independent witness recognition; the true circumstances — including beatings, torture, and the feeding of crime details — under which the statements of Higgins-Bey and Gomez were obtained; the fact that McCastle's "confession" was wholly fabricated; the polygraph results and other evidence implicating Rudolfo Ramirez as the actual perpetrator; and the evidence that Torres could not have committed the crime.

69. Defendants willfully suppressed this material, exculpatory, and impeaching information from the jury, from Harry Rodriguez, and from his defense counsel.

70. Had this information been disclosed, there is a reasonable probability that the outcome of Harry Rodriguez's trial would have been different. Its suppression deprived Mr. Rodriguez of his constitutional right to due process under the Fourteenth Amendment, and caused the injuries described herein.

**COUNT III – 42 U.S.C. § 1983 Failure to Intervene**

71. Each paragraph of this Complaint is incorporated as if restated fully herein.

72. One or more of the Defendants stood by without intervening to prevent the constitutional violations described herein — including the coercion and fabrication of statements, the torture of Fernando Gomez, the fabrication of McCastle's confession, and the suppression of exculpatory evidence — even though they had a reasonable opportunity to do so.

73. The misconduct described in this Count was objectively unreasonable and was undertaken with willful indifference to Harry Rodriguez's constitutional rights, and directly and proximately caused his wrongful conviction, imprisonment, suffering, and death.

**COUNT IV – 42 U.S.C. § 1983 Conspiracy to Deprive Constitutional Rights**

74. Each paragraph of this Complaint is incorporated as if restated fully herein.

75. Defendants Halvorsen, Dickinson, Kijowski, Palasz, Guevara, and Kopec, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to deprive Harry Rodriguez of his constitutional rights, including his rights to due process and a fair trial.

76. In furtherance of this conspiracy, each of these Defendants engaged in and facilitated overt acts, including but not limited to: Defendant Kijowski's fabrication of the identification of Mr. Rodriguez; Defendant Palasz's execution of arrests based on that fabricated identification; the coercion and fabrication of false statements from Higgins-Bey, the Cardona brothers, and Gomez; the fabrication of McCastle's confession; the arrangement of false trial testimony through plea deals; and the suppression of exculpatory evidence.

77. In so doing, these co-conspirators agreed to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Harry Rodriguez of his constitutional rights.

78. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

79. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Harry Rodriguez's clear innocence.

80. As a direct and proximate result of this conspiracy, Harry Rodriguez's rights were violated and he suffered the injuries described herein, including his wrongful conviction, life imprisonment, suffering from Multiple Sclerosis while incarcerated, and death in prison.

**COUNT V – State Law Claim– Malicious Prosecution**

81. Each paragraph of this Complaint is incorporated as if restated fully herein.

82. Defendants Halvorsen, Dickinson, Kijowski, Palasz, and Guevara, despite knowing that probable cause did not exist to prosecute Harry Rodriguez for the murder of Raymond Carvis, acted individually, jointly, and in concert to cause Mr. Rodriguez to be arrested, charged, and prosecuted. The sole evidence against him — the identification manufactured by Defendant Kijowski, and the resulting coerced and fabricated statements of Higgins-Bey and Gomez — was entirely the product of Defendants' own misconduct. Defendants knew this and proceeded anyway.

83. Defendants failed to investigate evidence, including the substantial evidence implicating Rudolfo Ramirez, that could have led to the identification of the actual perpetrator and would have exonerated Harry Rodriguez.

84. The criminal proceedings against Harry Rodriguez terminated in a manner indicative of his innocence when, on July 1, 2025, the Circuit Court granted the Petition for Relief from Judgment and the State nolle prossed all charges.

85. As a direct and proximate result of this malicious prosecution, Harry Rodriguez suffered wrongful conviction, life imprisonment, physical suffering and death from Multiple Sclerosis while incarcerated, and all other injuries described herein. His Estate and survivors have suffered the additional injuries cognizable under the Illinois Wrongful Death Act.

**COUNT VI – State Law Claim Intentional Infliction of Emotional Distress**

86. Each paragraph of this Complaint is incorporated as if restated fully herein.

87. The acts and conduct of Defendants Halvorsen, Dickinson, Kijowski, Palasz, Guevara, and Kopec as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power and authority and were undertaken with intent to cause, or in reckless disregard of the probability that their conduct would cause, severe emotional distress to Harry Rodriguez.

88. As a direct and proximate result of Defendants' actions, Harry Rodriguez suffered severe emotional distress and anguish throughout his wrongful incarceration, including during the years in which he suffered from Multiple Sclerosis while imprisoned. This claim survives his death and is brought by the Estate of Harry Rodriguez pursuant to Illinois survival statutes.

**COUNT VII – State Law Claim Civil Conspiracy**

89. Each paragraph of this Complaint is incorporated as if restated fully herein.

90. As described throughout this Complaint, Defendants Halvorsen, Dickinson, Kijowski, Palasz, Guevara, and Kopec, acting in concert with known and unknown co-conspirators, conspired by concerted action to accomplish unlawful purposes by unlawful means, including the malicious prosecution of Harry Rodriguez and the intentional infliction of severe emotional distress upon him.

91. Each of these Defendants committed unlawful overt acts in furtherance of this conspiracy, and was an otherwise willful participant in joint activity, as described herein.

92. As a direct and proximate result of this conspiracy, Harry Rodriguez suffered the injuries described throughout this Complaint, including his wrongful conviction, life imprisonment, suffering and death from Multiple Sclerosis while incarcerated, and all other damages described herein.

**COUNT VIII – 42 U.S.C. § 1983 Municipal Liability**

93. Each paragraph of this Complaint is incorporated as if restated fully herein.

94. The actions of Defendants Halvorsen, Dickinson, Kijowski, Palasz, and Guevara were undertaken pursuant to de facto policies and practices of the Chicago Police Department, including: (a) the use of physically and psychologically coercive interrogation tactics, including physical torture, to obtain confessions and witness statements; (b) the fabrication of confessions, identifications, statements, and police reports; (c) the suppression of exculpatory evidence, including evidence implicating alternative suspects; (d) the targeted use of these tactics against young Hispanic men identified through gang affiliation rather than through legitimate investigative processes; (e) the failure to properly train, supervise, discipline, monitor, or otherwise control officers — including Defendants Halvorsen and Guevara — who were repeatedly accused of

fabricating evidence and coercing false confessions; and (f) a code of silence pursuant to which officers were required to remain silent about or cover up misconduct by fellow officers.

95. These policies and practices were maintained with deliberate indifference by City of Chicago policymakers, who had actual knowledge — both before and after Harry Rodriguez's wrongful conviction and death — of Defendants Halvorsen's and Guevara's pattern and practice of fabricating evidence and framing innocent men, as demonstrated by the numerous vacated wrongful convictions attributable to these officers.

96. These policies and practices were, separately and together, a direct and proximate cause — a moving force — of the constitutional violations committed against Harry Rodriguez, his wrongful conviction, his life imprisonment, his suffering and death from Multiple Sclerosis while incarcerated, and all other damages described herein.

**COUNT IX – State Law Claim Respondeat Superior**

97. Each paragraph of this Complaint is incorporated as if restated fully herein.

98. In committing the acts alleged herein, Defendants Halvorsen, Dickinson, Kijowski, Palasz, and Guevara were agents of the Chicago Police Department, acting within the scope of their employment and under color of law at all relevant times.

99. Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

**COUNT X – State Law Claim Indemnification**

100. Each paragraph of this Complaint is incorporated as if restated fully herein.

101. Illinois law provides that public entities are directed to pay tort judgments for compensatory damages for which their employees are liable while acting within the scope of their employment.

102. Defendants Halvorsen, Dickinson, Kijowski, Palasz, and Guevara were employees of the Chicago Police Department acting within the scope of their employment in committing the misconduct described herein. Defendant City of Chicago is therefore liable for any judgment entered against them.

103. Defendant Kopec was at all times material to this Complaint an employee of the Cook County State's Attorney's Office. Defendant Cook County is therefore responsible for any judgment entered against Defendant Kopec arising from his employment, making the County a necessary party to this Complaint.

WHEREFORE, Plaintiff, DANIEL RODRIGUEZ, as Executor of the Estate of HARRY RODRIGUEZ, respectfully requests that this Court enter judgment in his favor and against Defendants Special Representative for ERNEST HALVORSEN, EDWIN DICKINSON, and REYNALDO GUEVARA, Special Representative for LIEUTENANT EDWARD KIJOWSKI, OFFICER DENNIS PALASZ, former Cook County Assistant State's Attorney BILL KOPEC, the CITY OF CHICAGO, the COUNTY OF COOK, and as-yet UNKNOWN CITY OF CHICAGO EMPLOYEES, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems appropriate, including damages under the Illinois Wrongful Death Act and Illinois survival statutes.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

DANIEL RODRIGUEZ, as Executor of the Estate of HARRY RODRIGUEZ

By,

/s/ Jon Neuleib
Jon Neuleib

One of his attorneys

Erickson & Oppenheimer, Ltd.
223 W. Jackson, Suite 612
Chicago, IL 60606
312-327-3370